564 So.2d 727 (1990)
STATE of Louisiana, Plaintiff-Appellee,
v.
Mark Douglas McGRAW, Defendant-Appellant.
No. 21538-KA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1990.
*728 Steven R. Thomas, Mansfield, for defendant-appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, William R. Jones, Dist. Atty., Coushatta, for plaintiff-appellee.
Before HALL, JONES and LINDSAY, JJ.
HALL, Chief Judge.
After a jury trial, defendant, Mark Douglas McGraw, was found guilty as charged of aggravated rape, LSA-R.S. 14:42, and was sentenced to life imprisonment without benefit of parole, probation or suspension of sentence. He appealed, asserting four assignments of error. For the reasons stated below, we affirm.

FACTS
The victim, age 49, and her grandchild, Jessica, age six, checked into the Worth Motel in Coushatta, Louisiana on August 12, 1988 at approximately 5:30 p.m. After dinner, the victim and her grandchild returned to the motel room. According to the victim, she locked the door by pushing and turning the door handle and securing the night chain. Around midnight, she got up to use the rest room. Before returning to bed, she checked the door to be sure it was locked. At this time, Jessica was asleep in her own double bed.
The next thing the victim realized, a man was on top of her holding a tire tool in his right hand. The assailant covered the victim's mouth with his left hand and told her to "do as I say, or I am going to hurt your daughter." The victim told her assailant that the child was her granddaughter "and for God's sakes, don't hurt her." The assailant demanded the victim remove her gown or he would gash her head open with the tire tool if she did not cooperate. He explained he had a knife and a gun inside his boots. However, the victim only noticed his boots and did not notice a weapon other than the tire tool.
After the victim took her gown off, her assailant pulled his pants down to his knees and raped her. The victim told her assailant she was expecting her husband and son to arrive at any moment. The assailant told the victim he would kill her or any member of her family if they showed up at the door.
After allowing the victim to dress, the assailant demanded the victim drive him to the other side of town. He shoved her inside the car through the driver's door. The victim attempted to crawl out the passenger door, but was stopped by the assailant. She was able to wedge her hand in the passenger door. The assailant drove the car, a 1986 blue Ford Escort, out of the parking lot and onto the main road. The victim was screaming. As the assailant released her arm in order to shift the car into fifth gear, the victim bailed out of the car. She ran and screamed for help. She hid behind a building and watched the blue Escort head toward the bridge. She then ran into the middle of the street and attempted to stop a moving car. When she looked up, the victim saw the blue Escort make a U-turn and head toward the motel. Fearing the assailant was driving to the motel to get her granddaughter, the victim ran into Christine Florane's yard and beat on the front door. The Floranes called the police. Officer Scotty Hill arrived and took the victim to the motel.
When Officer Hill and the victim arrived at the motel, Officer Adams, Deputy Clift, and Capt. Rhodes were already present. The officers entered Room 4 and found a small female child asleep in the first bed. The second bed was in disarray. The door was unlocked, the air conditioner was running, the window in the front of the room closest to the door was halfway open and its screen was off. The officers collected the items lying on the second bed, such as the victim's nightgown, the bedspread and the sheets.
After the victim put Jessica into Officer Hill's patrol unit, the three of them drove to the hospital, where Dr. Hanna, the coroner, performed a sex crime examination on the victim. After the test, Hill and the *729 victim drove to Shreveport. Officer Hill dropped the victim off at the Shreveport Police Department while he drove to the crime lab to deposit the results of the sex crime examination, along with the bedspread, sheets, pillowcases and the metal screen from the motel window for analysis. During this time, the victim worked with Officer Cheryl Jeter at the Shreveport Police Department and made a composite of her assailant. When Officer Hill picked up the victim at the police station, he received a photocopy of the composite.
Meanwhile, Officer Jodie Lester was filling out an arrest warrant for Mark McGraw, the defendant in this case. Based on the description the victim gave Officer Hill of her assailant and the description of Mark McGraw, a guest at the Worth Motel, from Mr. Patel, the owner, Mark McGraw became a suspect.
Next, the victim, Capt. Rhodes and Officer Lester drove to Jasper, Texas. At Jasper, the victim was shown a photographic lineup consisting of five photographs. She identified No. 2 as her assailant. Approximately two hours later, the victim was asked to identify, if possible, her assailant in a physical lineup. She identified No. 3 as her assailant. On both occasions, the victim chose Mark McGraw.
Mark McGraw was subsequently arrested and was indicted on August 29, 1988 by the grand jury with aggravated rape, LSA-R.S. 14:42. He was also charged by bill of information with aggravated kidnapping, LSA-R.S. 14:44, and unauthorized use of a movable, LSA-R.S. 14:68. On October 14, 1988, defendant and others escaped from prison in Red River Parish. As a result of T.V., newspaper and radio publicity, defendant filed a motion for change of venue. He also filed a motion to suppress the photographs and out-of-court identification. The motion for change of venue was referred to the merits to determine if a jury could be selected. The motion to suppress was denied. Defendant then filed a motion in limine to reurge his motion to change venue and, alternatively, requested voir dire be conducted with a "dummy" jury venire, or individually. The voir dire requests were denied.
After trial on the aggravated rape charge, defendant was convicted by jury as charged. He was sentenced to life imprisonment. Defendant now appeals his conviction and sentence based on four assignments of error.

CHANGE OF VENUE

ASSIGNMENTS OF ERROR NO. 1 AND 2:
Defendant first assigns as error the trial court's failure to grant his motion for change of venue based on prejudicial pre-trial publicity. Defendant argues the trial court erred in failing to grant his pre-trial motion and referring the ruling to the merits "to determine if a jury can be selected." He further argues that the trial court erred in failing to grant individualized voir dire of prospective jurors, or voir dire with a dummy panel to determine if prospective jurors had been influenced by the pre-trial publicity. Defendant asserts that the method of jury selection denied him an opportunity to conduct a full and complete voir dire.
The trial court deferred the ruling on the motion to change venue until the attempt to pick the jury had occurred. Whether a defendant has made the requisite showing for a change of venue to be granted is a question addressed to the sound discretion of the trial court. State v. Edwards, 406 So.2d 1331 (La.1981), cert. denied 456 U.S. 945, 102 S.Ct. 2011, 72 L.Ed.2d 467 (1982). Postponing final action on a motion for change of venue until completion of voir dire is also proper. State v. Brogdon, 426 So.2d 158 (La.1983); State v. Ware, 478 So.2d 790 (La.App. 3d Cir.1985). The grounds for a change of venue are provided in LSA-C.Cr.P. Art. 622:
"A change of venue shall be granted when the applicant proves that by reasons of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the *730 parish where the prosecution is pending."
In deciding whether to grant a change of venue, the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of the jurors on the voir dire examination or the testimony of witnesses at the trial."
In determining whether or not a change of venue should be granted, the trial court should consider a number of factors. State v. Bell, 315 So.2d 307 (La.1975) held:
"Some relevant factors in determining whether to change venue are (1) The nature of pre-trial publicity and the particular degree to which it has circulated in the community, (2) The connection of government officials with the release of the publicity, (3) The length of time between the dissemination of the publicity and the trial, (4) The severity and notoriety of the offense, (5) The area from which the jury is to be drawn, (6) Other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) Any factors likely to affect the candor and veracity of the prospective jurors on voir dire. See generally, annotation 33 A.L.R.3d 17 (1970)."
Other factors relevant to the inquiry include the degree to which the publicity has circulated in the areas to which venue could be changed, the care exercised, and the ease encountered in the selection of the jury, the familiarity with the publicity complained of and the resultant effect upon the prospective jurors, and the peremptory challenges and challenges for cause exercised by the defendant in jury selection. State v. Berry, 329 So.2d 728 (La.1976); State v. Henry, 446 So.2d 1308 (La.App. 2d Cir.1984).
In order to warrant a change of venue, defendant must show more than mere public knowledge of the facts surrounding the offense. They must show that such prejudice exists in the collective mind of the community that a fair trial is impossible. State v. Henry, supra; State v. Coutee, 545 So.2d 571 (La.App. 2d Cir. 1989) writ denied 551 So.2d 1335 (La.1989).
In the instant case, the publicity complained of occurred not only in the parish where the trial took place but also in neighboring parishes. Further, a jury was seated within one day, and only three panels of jurors were questioned in order to obtain the jury. Few, if any, of the jurors had knowledge of the case, or either the defendant or the victim. Both defendant and the victim were from out of state. Further, our careful review of the prospective jurors' responses leads us to conclude that the prerequisite prejudice did not exist in the community.
The record shows that the trial court called the prospective jurors to voir dire in panels of 12. After questioning by the trial court, both the state and defense were given an opportunity to question prospective jurors. Both the state and the defense availed themselves of the opportunity to question the panel, both en masse and individually. The jury was completed after three panels were questioned.
There is no provision in our law which either prohibits or requires the sequestration of prospective jurors for an individual voir dire. State v. Comeaux, 514 So.2d 84 (La.1987). The trial court has discretion to decide whether the jurors should be called singly or in groups. LSA-C.Cr.P. Art. 784, Comment c. A trial court has the discretion to permit individual voir dire if a defendant can demonstrate that special circumstances are present. LSA-C.Cr.P. Art. 3; State v. Comeaux, supra; State v. Copeland, 530 So.2d 526 (La.1988).
Here, defendant has not shown special circumstances justifying individual voir dire. The record establishes that out of 38 prospective jurors, 25 were excused or dismissed. It does not appear that any of the prospective jurors were challenged for cause. The record reflects that defense counsel asked prospective jurors if they knew the defendant, had heard any publicity about the case either from television, radio or from reading newspapers, whether such publicity would prevent them from giving defendant a fair trial, and whether *731 such publicity would prevent them from presuming the innocence of defendant. Based on the answers of the prospective jurors, the record reflects that defense counsel was able to excuse those whom he felt were prejudiced.
Defendant also argues that a dry-run voir dire should have been conducted with a dummy jury venire. However, defendant has not established that the extent of publicity was such that no jury could be seated. That a jury was completed within one day contradicts defendant's assertion that the publicity of defendant's subsequent offenses necessarily prejudiced the jury venire. Therefore, these assignments of error are without merit.

MOTION TO SUPPRESS

ASSIGNMENT OF ERROR NO. 3:
Defendant argues the trial court erred in denying his motion to suppress the identifications made of him in the photographic lineup and physical lineup in Texas. He further asserts that the victim's out-of-court identification is unreliable.
A defendant attempting to suppress an identification must prove that the identification itself was suggestive and that there is a likelihood of misidentification as a result of the procedure. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Cotton, 511 So.2d 1207 (La.App. 2d Cir. 1987). Even if the court finds that the procedure used was suggestive, an identification will be admitted if, under the totality of the circumstances, the identification is found to be reliable. State v. Davis, 409 So.2d 268 (La.1982); State v. Dauzat, 364 So.2d 1000 (La.1978); State v. Cotton, supra.
The trial court did not err in denying the motion to suppress out-of-court identification of the defendant by the victim. The victim had already furnished a description of the defendant on the night the incident occurred. This description, along with information that the defendant had registered in the same motel, led to the issuance of a warrant for his arrest. There was nothing suggestive about the photographs or the physical lineup. Furthermore, the victim had ample opportunity during the offense and subsequent to the offense in a well-lighted parking lot, to observe the defendant's appearance. Further, the identikit representation of the assailant, which the victim prepared in Shreveport on the day following the attack, bears a striking resemblance to the defendant.
The defendant contends the identification was also unduly suggestive as the defendant was the only individual present in both the photographic and the physical lineup. This argument was discredited by the Louisiana Supreme Court in State v. Neslo, 433 So.2d 73 (La.1983).
This assignment of error is without merit.

SUFFICIENCY OF EVIDENCE

ASSIGNMENT OF ERROR NO. 4:
By this assignment of error, the defendant claims that the evidence presented at trial is insufficient to sustain his conviction. In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The appellate court must determine that the evidence, when viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.
An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the evidence by viewing that evidence in the light most favorable to the prosecution. When the evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Captville, 448 So.2d 676 (La.1984).
Viewing the evidence in the light most favorable to the prosecution, there is *732 sufficient evidence to support defendant's conviction. The victim testified that defendant entered her motel room at night without her consent and raped her. The victim positively identified defendant as her assailant during the photographic lineup, the physical lineup, the hearing on the motion to suppress, and at trial. The victim further testified that defendant was armed with a tire tool, with which he threatened her. Defendant also informed the victim that he was armed with a knife which he kept in his boot.
The owner of the motel testified that defendant had checked into the motel earlier in the week with a co-worker, Jason Myers. Myers testified that he had to knock on defendant's door a few extra times the morning after the rape and that he thought defendant had a hangover. Another co-worker, Joe Earl Snyder, testified that he and defendant went out in his truck on Thursday, August 11, 1988, the night of the crime, to have a few beers at a lounge. They returned to the motel around 11:00 p.m. and retired to separate rooms. Snyder noticed that a tire tool was missing from his truck on Friday. Snyder testified that defendant had ridden in his truck during the week, and they had cooked out in the back of the truck. The tire tool was in open view in back of the truck. Snyder positively identified the tire tool presented at trial, which was retrieved from the victim's car. He testified that he could identify the tire tool because of a unique bend in the tool.
Jodie Lester, the City Marshal of Coushatta, testified to investigating the incident. He testified that the missing 1986 blue Ford Escort owned by the victim was found behind some bushes close to the Worth Motel. He testified a tire tool was lying on the driver's side between the door and the seat. He identified a photograph depicting where the tire tool was found.
Dr. Hanna, the coroner for Red River Parish, testified to examining the victim. He stated he was unable to tell whether the victim had engaged in sexual intercourse, observing no external trauma. Mr. Pat Wojtkiewicz, accepted as an expert in the field of serology and hair and fiber identification, examined the rape examination kit which was performed on the victim and sent to the Northwest Louisiana Crime Lab. He testified to finding the presence of spermatozoa on two smear slides, which was consistent with a person who had sexual intercourse. He further testified to examining pubic hairs found on the bedspread taken from the victim's bed at the motel and comparing them to known pubic hairs taken from the defendant as a result of the sex crime suspect kit. He testified that the hairs had the "same microscopic characteristics and that the hair could have come from Mark McGraw." He further testified that the hairs from inside the blue Ford Escort also had the same microscopic characteristics as those of the defendant.
Thus, we find that the evidence presented, when considered in the light most favorable to the prosecution, was sufficient to prove each and every element of the crime with which defendant was charged beyond a reasonable doubt. This assignment of error is without merit.

CONCLUSION
Finding no merit to the defendant's assignments of error, his conviction for aggravated rape and his sentence to life imprisonment without benefit of parole, probation or suspension of sentence are affirmed.
AFFIRMED.