621 So.2d 641 (1993)
STATE of Louisiana, Appellee,
v.
Jeffrey Andre SAVAGE, Appellant.
No. 24881-KA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*643 Carso & Noel by Robert S. Noel, II, Monroe, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, Jerry L. Jones, Dist. Atty. and Michael A. Jedynak, Asst. Dist. Atty., Monroe, for appellee.
Before LINDSAY, VICTORY and WILLIAMS, JJ.
LINDSAY, Judge.
The defendant, Jeffrey Andre Savage, appeals from his convictions of two counts of aggravated rape, in violation of LSA-R.S. 14:42; one count of attempted aggravated rape, in violation of LSA-R.S. 14:27 and 14:42; and three counts of first degree robbery, in violation of LSA-R.S. 14:64.1. For the reasons assigned below, we affirm.

FACTS
In the early morning hours of April 21, 1990, the defendant broke into the Monroe apartment of two young female NLU students, M.K. and K.H. At about 4:30 a.m., the roommates, who had retired to their bedroom, and a female guest, M.C., who was sleeping on the living room sofa, heard a knock at their front door and the voice of a man claiming to be a security guard. M.K. left the bedroom and entered the living room in response to the knock. M.C. approached the front door to investigate. As she did so, the door was suddenly forced open by a man subsequently identified as the defendant, and M.C. was thrown backwards against the wall.
The defendant entered the apartment and grabbed M.C. by the hair. He told M.K. to come to him or he would blow M.C.'s head off. When M.K. complied with his demand, he forced her to her knees and grabbed her by the hair also.
K.H. had initially remained in the bedroom but entered the living room to investigate the commotion. She saw the defendant point a dark object the size of a handgun at M.C.'s head. He ordered K.H. to the floor with the other girls, threatening to shoot M.C. if she failed to comply. At this point, M.C. saw a shiny object in the defendant's hand and what appeared to be the strap of a pistol holster. The defendant intertwined the hair of the three girls and dragged them on their knees into the bedroom.
In the bedroom, the girls were tied up with items of clothing taken from a laundry basket. The defendant also placed pillowcases over their heads. He then raped M.C. Next he attempted to rape M.K., but, due to her resistance, he decided to move on to the next victim. He raped K.H. twice and forced her to perform oral sex on him twice. The defendant consistently threatened to "blow their heads off" if any of the victims screamed or tried to look at him.
Between the sexual assaults, the defendant ransacked the bedroom, looking for money and other valuable items. He robbed each of the girls of her personal jewelry, including one girl's engagement and wedding rings.
Eventually, the defendant left the bedroom, shutting the door behind him. M.K. was able to free herself, and she untied the other victims. The defendant then tried to reenter the bedroom. However, the girls slammed the door shut and repelled the defendant's efforts to force the door open again. The girls also began screaming loudly for help and pounding on the walls to wake up their neighbors. The defendant fled the apartment, taking several items including the victims' purses, jewelry, M.C.'s bank automatic teller machine (ATM) card, and M.K.'s moon-faced watch.
Later that day, an attempt was made to use M.C.'s bank card at the ATM machine on the NLU campus. Through bank records, the police contacted the bank customer who used the automatic teller immediately thereafter. This customer described the person who tried to use the ATM machine *644 before him as a black male, about 5'11" or taller, with a stocky build. The customer specifically recalled that the man wore a Mexican sombrero hat, flowery-looking Hawaiian shorts, and sunglasses.
The victims were able to give the police a general description of the assailant. On April 24, 1990, a police artist drew a composite of the rapist based on information provided by M.C. and M.K. A poster of the composite was distributed to local law enforcement agencies. The director of police on the NLU campus saw the poster and recognized the defendant, who had formerly been a student worker for the campus police. He contacted the Ouachita Parish Sheriff's office, which was in charge of the investigation, and supplied them with the defendant's name.
On April 25, 1990, Deputies Gary Carver and Connie Miller showed the girls photo lineups containing the defendant's photo. All three victims identified the defendant as the rapist.
The deputies learned that the defendant and his girl friend were being evicted from an apartment in the same complex where the rapes occurred. Consequently, they obtained a search warrant for the defendant's old apartment, as well as the new apartment into which he was moving. A search of the defendant's new apartment led to the recovery of clothes matching those worn by the man who used M.C.'s bank card, i.e., the sombrero, two pairs of Hawaiian-looking shorts, and a pair of sunglasses. (When Deputy Miller showed these items to the customer who observed the man at the ATM machine, he positively identified the sombrero and the sunglasses, and he said that the shorts were similar to those which the man was wearing.) The authorities also recovered M.K.'s moon-faced watch, which was taken from the victims' apartment by the rapist.
The defendant was arrested on April 25, 1990. Two of the three victims picked the defendant out of a live lineup later that night.
The defendant was charged with two counts of aggravated rape, one count of attempted aggravated rape, and three counts of first degree robbery. (He was also charged separately with one count of aggravated oral sexual battery against K.H.)
At trial, all three victims positively identified the defendant as their assailant. The defendant testified in his own behalf. He also presented the testimony of his girl friend, Shondra Skipper, who testified somewhat equivocally as to his presence at home at the time the rapes occurred.
The defendant was convicted of all six charges. On each of the two charges of aggravated rape, he was sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On the charge of attempted aggravated rape, he was sentenced to 50 years at hard labor. On each of the three counts of first degree robbery, the defendant was sentenced to 25 years at hard labor without benefit of parole, probation or suspension of sentence. The court directed that the sentences for the crimes against each of the three victims were to run concurrently with each other, but consecutively to the sentences for the offenses against the other victims.
The defendant appealed. He initially filed three assignments of error, but he failed to brief one of them. Consequently, it is deemed abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App.2d Cir.1989), writ denied, 558 So.2d 1123 (La.1990). The two remaining assignments of error are as follows: (1) the trial court erred in admitting the photographic lineup into evidence because it was overly suggestive; and (2) the evidence presented at trial was insufficient to support the defendant's convictions.

SUGGESTIVENESS OF PRE-TRIAL IDENTIFICATIONS
The defendant contends that the lineups were unduly suggestive. Although he refers to both the physical and the photo lineups in his brief, at trial the defendant objected only to the evidence of the photo lineups. (Also, in his assignments of error *645 filed in the trial court, the defendant complains only of the photo lineups.) A new basis for an objection cannot be raised for the first time on appeal. State v. Cressy, 440 So.2d 141 (La.1983); State v. O'Neal, 501 So.2d 920, 924 (La.App.2d Cir.1987), writ denied, 505 So.2d 1139 (La.1987); LSA-C.Cr.P. Art. 841. Therefore, the only issue before us is whether the pre-trial identifications at the photo lineups were overly suggestive.
A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there is a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d 729 (La.1984); State v. Cotton, 511 So.2d 1207 (La.App.2d Cir.1987); State v. McGraw, 564 So.2d 727 (La.App.2d Cir.1990), writ denied, 567 So.2d 1126 (La.1990). A lineup is unduly suggestive if the procedure focuses attention on the defendant. State v. Tucker, 591 So.2d 1208 (La.App.2d Cir. 1991), writ denied, 594 So.2d 1317 (La. 1992); State v. Cotton, supra. Even if the court finds that the procedure used was suggestive, an identification will be admitted if, under the totality of the circumstances, the identification is found to be reliable. State v. McGraw, supra; State v. Mims, 501 So.2d 962 (La.App.2d Cir. 1987).
Our review of the evidence reveals that the photo lineups were not conducted in a suggestive manner. On the day of the rapes, the victims were shown a photo lineup from which none of them made any identification; the defendant's photo was not in that lineup. Subsequently, M.K. and K.H. were both shown another photo lineup, which included the defendant's photo. These two girls were shown the lineup separately, and both identified the defendant. M.C. was shown a different lineup; the officers had changed the defendant's position in the lineup just in case there had been any communication with the other victims. M.C. also identified the defendant. The officers who presented the lineups to the victims in no way suggested which, if any, photograph they should select. Furthermore, the men in the photographs were sufficiently similar in their general appearance to reasonably test the identification.
Even if we were to assume arguendo that the identification procedure was suggestive, the identification will not be suppressed unless a likelihood of misidentification is shown. The factors considered in assessing the reliability of the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the degree of attention paid by the witness to the criminal; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time elapsing between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); State v. Mims, supra.
The defendant asserts that the victims had only one chance to view the rapist's face, i.e., when he attempted to force his way back into the bedroom after the rapes were accomplished. The evidence shows that after the rapist initially entered the apartment, he ordered the victims not to look at him and forced them to keep their heads down. Once he had dragged them into the bedroom, he blindfolded them or otherwise tried to cover their faces to prevent them from seeing him.
However, M.C. testified that she had an opportunity to see the man's face when he initially forced his way into the apartment. The illumination from a balcony light and the outside street lights allowed her to observe his face for at least 30 seconds. Furthermore, M.C. testified that she was looking directly at the man for at least 45 seconds as he later tried to force his way back into the bedroom. (In fact, he noticed her close observation and yelled at her to stop looking at him or he would kill her.) The bedroom lights were on at that time, and she was only about five feet away from him.
The attention of all three victims was completely riveted on the rapist as he tried to reenter the bedroom. M.K. not only saw *646 the rapist at this point, but earlier she was also able to see under her makeshift blindfold and observe the defendant as he assaulted the other two victims.
The defendant attacks the identifications on the basis that neither K.H. nor M.C. was wearing glasses at the time of the offenses; however, the record demonstrates that only K.H. had any vision problems. Although K.H. was not wearing her glasses or contacts at the time of the assaults, she is nearsighted and is consequently able to see things close to her. K.H. testified that when the defendant attempted to force his way back into the bedroom, she was about one foot from him. At this time, she also observed that the rapist was about her height of 6'1".
The defendant further contends that all three girls had been drinking and involved in a "row" at an after-hours night club earlier that night. However, this assertion is not supported by the record. K.H. and M.C. testified that between 9:30 and 11:30 p.m. they shared one liter of an alcoholic beverage known as "Fire and Ice;" the rapes did not occur until after 4:30 a.m., at least five hours later. The record shows that neither of these girls was intoxicated that night. Furthermore, M.K. consumed no alcohol that evening. Although the girls were earlier involved in a verbal argument with a former roommate, it was apparently only a minor dispute, and it certainly had no effect on the victims' subsequent identification of the defendant.
As to the degree of attention paid by the victims to the rapist at the time of the offenses, we note that M.K. in particular testified that she deliberately tried to get a good look at the rapist so she could identify him if she survived the ordeal. Given the nature of the offenses and the fact that the victims felt their lives were in danger, it is apparent that all of the victims were paying a high degree of attention.
The descriptions of the rapist given by the victims were detailed and consistent. They described their assailant as a black male in his mid-twenties who was about 6' tall with a stocky build. They particularly noted that he had a flattop haircut which was cut closer on the sides. He wore a dark (possibly navy blue) jogging suit and white tennis shoes. The composite drawn by the police artist with the input of M.C. and M.K. bore a strong resemblance to the defendant. In fact, this resemblance was so striking that when the chief of the NLU campus police first saw the poster, he immediately recognized the defendant.
At the time they viewed the photo lineups, only K.H. demonstrated any hesitation. The two other victims immediately recognized the defendant. K.H.'s initial hesitation was apparently caused by her vision problems which prevented her from observing the rapist as clearly as had her friends.
As to the final factor in assessing the reliability of the identification, the time between the offenses and the confrontation, we note that the rapes occurred on the morning of April 21, 1990. The composite which led to the identification of the defendant as a suspect was drawn on April 24, 1990, and the victims were shown the photo lineups containing the defendant's photo on April 25, 1990.
Based on the foregoing, we conclude that the photo lineups were not suggestive. However, even assuming arguendo that they were suggestive, the identifications of the defendant by the victims were reliable.[1]
This assignment of error is meritless.

SUFFICIENCY OF EVIDENCE

Law
When assessing the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable *647 to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged and the defendant's identity as the perpetrator of that crime. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Moore, 477 So.2d 1231 (La.App. 1st Cir. 1985), writs denied, 480 So.2d 739, 741 (La. 1986); State v. Jacobs, 504 So.2d 817 (La. 1987); State v. Dominick, 545 So.2d 1149 (La.App. 4th Cir. 1989).
In addition, when circumstantial evidence partly forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1983). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. La.R.S. 15:438 is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, supra.

State v. Augustine, 545 So.2d 1203 (La. App. 4th Cir.1989); State v. Dominick, supra.
A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App.2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).

Discussion
The defendant contends that there was insufficient evidence to support his convictions. Specifically, he first argues that the victims' identifications of him were tainted for the reasons already discussed under the previous assignment of error, i.e., their alleged lack of opportunity to view the rapist, as well as their alleged alcohol consumption and vision problems. As we have previously noted, these contentions have no merit.
The defendant next contends that the testimony of two of his witnesses, Shondra Skipper and Sarah Diane Robinson, established that he was at home at the time these offenses occurred and that these crimes were most likely committed by a man named Donald Sumler who resembled the defendant. This contention is also unsupported by the record.
Ms. Skipper, the defendant's live-in girl friend at the time of the offenses, testified that on the night of April 20, 1990, she and the defendant fell asleep on the sofa in their living room. (At the time of the offenses, they still lived in the apartment complex where the rapes occurred.) At about 4:30 a.m. on April 21, 1990, there was a knock on their front door. Ms. Skipper looked through the peephole in the front door, then told the defendant that two men were there to see him. The defendant stepped outside for about two minutes before returning inside. He and Ms. Skipper then went to bed.
On direct examination, Ms. Skipper testified that she did not know whether the defendant left the apartment again that night. She testified that it was possible that she would have known if he had left the apartment again. However, she further testified that if the defendant had left again, "I would have known or I might not have known." [Emphasis ours.]
Ms. Robinson, the defendant's neighbor, testified that her apartment was upstairs and two doors to the right of the defendant's apartment. She testified that at about 4:45 a.m. on the morning of April 20, 1990, the morning before the rapes, she saw the defendant go outside to his car. At exactly 4:30 a.m. on April 21, 1990, the morning of the rapes, she heard a knock downstairs. When she opened her door, she saw Donald Sumler and another man. Mr. Sumler asked her if she had seen the defendant. When she said she had not, the men left and walked toward another building in the apartment complex.
*648 Ms. Robinson specifically denied telling Deputy Gary Carver that she had seen the defendant enter or leave his apartment that morning. She further denied admitting to Deputy Carver that she had previously told Deputy Donnie Lewis about seeing the defendant outside at 4:30 a.m. on the morning of the rapes.
However, the State impeached this witness through the testimony of Deputy Carver and an audio tape of a statement she gave to this officer. On the tape, Ms. Robinson stated that on the morning of the rapes, about five minutes after Sumler and his companion walked away, the defendant came out of his apartment and walked over to his car. She spoke to the defendant and told him that Sumler had just left after knocking on his door. The defendant, who was wearing shorts, looked around for 15 to 30 seconds before walking back into his apartment. On the tape, Ms. Robinson also informed Deputy Carver that she recalled telling Deputy Lewis that she had seen the defendant outside on the morning of the rapes.
Deputy Carver testified on rebuttal that Ms. Robinson did not appear to be confused when she told him that she had seen the defendant outside on the morning of the offenses.
The defendant testified on his own behalf. He stated that Sumler and another man came to his apartment at 4:30 a.m. on the morning of April 21, 1990. He went outside to talk to them for a few minutes. He testified that after he went back inside the apartment, he did not leave again until much later in the day. He maintained that it was the morning before the rapes that he went out to his car at 4:30 a.m. to get a tape and that he saw Ms. Robinson on that occasion.
The jury was presented with a question of credibility. The victims unequivocally identified the defendant as the man who broke into the apartment and assaulted them. Ms. Skipper's testimony as to the defendant's presence at home on the morning of the rapes was equivocal at best. Not only was Ms. Robinson's testimony significantly impeached, but it also failed to correspond with that of the defendant, who testified that he spoke to Mr. Sumler on April 21, 1990. To the contrary, Ms. Robinson testified that Mr. Sumler left without seeing the defendant.
The jury obviously chose to believe the testimony of the victims over the conflicting testimony of the defendant and his two witnesses. Such a credibility determination was well within the province of the jury and will not be disturbed on appeal.[2]
Furthermore, the state presented physical evidence directly linking the defendant to the offenses. A watch belonging to one of the victims was recovered from the defendant's apartment, as were the unusual clothes worn by the defendant when he used the stolen bank card at the automatic teller machine.
Viewed in the light most favorable to the prosecution, a rational trier of fact could have found that the evidence proved that the defendant was guilty of the charged offenses beyond a reasonable doubt.
This assignment of error is without merit.

PRO SE SUPPLEMENTAL ASSIGNMENT OF ERROR
The defendant was represented on appeal by appointed counsel who filed assignments of error and an appellate brief. Subsequent to these filings, the defendant filed a pro se supplemental assignment of error in this court.
Pro se assignments of error by a represented defendant which were not timely filed or submitted to the trial court are not reviewable by this court on appeal. See State v. Gene, 587 So.2d 18 (La.App.2d Cir.1991), writ denied, 604 So.2d 993 (La. 1992), and State v. Tate, 593 So.2d 864 (La.App.2d Cir.1992).
*649 Therefore, we find that the defendant's pro se supplemental assignment of error is not properly before this court for review.

CONCLUSION
The defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] Although the defendant failed to properly raise the issue of the suggestiveness of the physical lineup, we have examined the photographs taken of this lineup. Contrary to his assertions, the heights and weights of the other men in the physical lineup were not significantly different from those of the defendant. The record demonstrates no unfairness or suggestiveness in the conduct of the live lineup.
[2] We also note that a photograph, which was taken of Mr. Sumler shortly after the commission of the offenses, was admitted into evidence, thus allowing the jury to evaluate for itself any alleged resemblance between Mr. Sumler and the defendant.