660 So.2d 537 (1995)
STATE of Louisiana, Appellee
v.
Fabian HARPER, Appellant.
No. 27278-KA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1995.
*539 Whitmeyer and Glassell, Shreveport, for appellant.
Richard Ieyoub, Attorney General, Baton Rouge, Paul J. Carmouche, District Attorney, and W. Stanley Lockard and Tommy J. Johnson, Assistant District Attorneys, Shreveport, for appellee.
Before SEXTON, NORRIS and WILLIAMS, JJ.
SEXTON, Judge.
The defendant, Fabian Harper, was charged by indictment with the second degree murder of Eddie Jo Johnson and the attempted second degree murder of Pariss Washington. A 12-member jury convicted the defendant of second degree murder in violation of LSA-R.S. 14:30.1 and acquitted him of attempted second degree murder. The defendant was sentenced to life imprisonment without benefit of parole, probation, *540 or suspension of sentence. He appeals, urging seven assignments of error. We affirm.

FACTS
Shortly after noon on September 5, 1990, Eddie Jo Johnson and Pariss Washington were shot just outside the front door of Ms. Johnson's home on Woodrow Street in Shreveport. The person who shot the victims took Ms. Johnson's purse. Ms. Johnson died and Ms. Washington was seriously injured.
Later that day, 16-year-old Eric Sloan was arrested while riding a stolen bicycle. The arresting officer searched him and found a check payable to Eddie Jo Johnson in his pocket. Eric Sloan admitted that he had been present on Woodrow Street that day but asserted that the defendant, Fabian Harper, also 16 years old, was the person who shot the victims.
On October 19, 1990, the defendant and Eric D. Sloan were charged with the first degree murder of Eddie Jo Johnson on September 5, 1990. On July 19, 1993, Eric Sloan pled guilty to conspiracy to commit armed robbery. He was later sentenced to seven years at hard labor. On November 22, 1993, an amended indictment was filed charging the defendant with the second degree murder of Eddie Jo Johnson and the attempted second degree murder of Pariss Washington.
At trial, the evidence included the testimony of many witnesses, including Eric Sloan. Eric Sloan's testimony was as follows: On September 5, 1990, Eric, his older brother, Darren Sloan, and the defendant walked from Eric's grandmother's house on Baxter Street to the pawn shop located near the corner of Greenwood Road and Jewella Avenue. On the way to the pawn shop, he and the defendant decided that they were going to get a car and some money that day. While Darren was in the pawn shop, he and the defendant went to the shopping center at the corner of Greenwood Road and Jewella Avenue. They saw a grey low-rider truck turn off Jewella Avenue onto a street. The defendant decided that he wanted the truck, so they walked down the street where it had turned until they saw it parked in front of a house.
The defendant said he was going to try to get the truck and went to the carport door of the house. Eric Sloan waited on the sidewalk by the ditch and saw two people come to the door. The defendant returned to Eric and said there were too many people at the house. They turned around and began walking back toward Jewella Avenue. At this time, Eric saw that the defendant had a .22-caliber pistol. Eric was familiar with the gun because his brother, Darren Sloan, had previously owned it and had painted it gold.
As they walked back toward Jewella Avenue, they saw a small car with a handicapped license pull up to a house. The defendant decided that they should take that car because it would be easy. Eric told the defendant that he was not going to do it. The defendant said that he was going to the door to see if a girl named Kelly lived there. Eric Sloan began walking away as the defendant went to the door. He heard loud voices but couldn't tell if the person the defendant was arguing with was male or female. He kept walking and heard something that sounded like firecrackers. The defendant came running by him with a purse and a gun and told him to run because "he had just burned two people." He saw the defendant throw the purse down and Eric picked it up. When he got to a gas station, he stopped running and looked inside the purse. He found a check and put it in his pocket.
Later that day, he was arrested because he was riding a stolen bicycle. When the police searched him, they found the check and began questioning him about the shooting. At first he made up stories, but eventually told them that the defendant shot the victims. He then took the police to the gas station where he discarded the purse.
Pariss Washington testified that on September 5, 1990, she and her daughter, Eddie Jo Johnson, had been grocery shopping in Ms. Washington's car, which had a handicapped license plate. They had just returned to Ms. Johnson's house when they heard a knock at the door. Ms. Johnson answered the door and Ms. Washington heard a man say he was looking for some lady who was supposed to live there. Ms. *541 Johnson told him that the person did not live there and they begin to argue. The man would not stop arguing and Ms. Johnson shouted "mother, bring my gun." Ms. Washington went to the door and saw Ms. Johnson standing outside the door with a young, black man. The man pulled Ms. Washington out of the door and she saw that he had a gun in his right hand that looked like a .22. He shot Ms. Washington in the head and then shot Ms. Johnson twice in the head. He ran into the kitchen and grabbed Ms. Johnson's purse off the cabinet and ran away. She only saw one man and she did not notice what he was wearing, other than a brown cap. She denied telling Sergeant Gary Alderman right after the shooting that the man was wearing a red shirt, black baseball cap and jeans.
Willie Joyce Wesley testified that she lived next door to Ms. Johnson's house on September 5, 1990. Shortly after noon, she heard four gunshots and ran into her dining room to look out the front window. She saw a young black man running across the yard with a gun in his left hand and a purse in the other hand. She only saw his profile. She stated that he had on blue jeans, a long-sleeved, red plaid, flannel shirt and a baseball cap. She described him as dark-skinned. She only saw one person.
Wanda Green testified that on September 5, 1990, she and her son, John Lane, lived down the street from Ms. Johnson at 3842 Woodrow Street. John Lane, who owned a grey Isuzu pickup truck came home for lunch that day. Shortly after he arrived, they heard a knock on the door. Ms. Green went to the door and saw a young black man. She described him as tall with high cheekbones and very pink gums and stated that he was wearing a green pullover T-shirt with white writing on it, dark pants, tennis shoes, and a cap. He appeared nervous and was sweating profusely. He asked her if someone lived there and when she replied that they did not, he asked her if she knew this person. She said she did not and called for Mr. Lane. When Mr. Lane came to the door, the man began to back away. He asked again if she was sure no one lived there by that name.
After he left the door, she saw another young man standing at the end of the driveway. He was wearing a red and blue plaid shirt and a cap. He had fairer skin than the man who came to the door. The man who approached the door went to the end of the driveway where the other young man was standing and they went across the street. She told Mr. Lane to go lock his truck because the young man appeared nervous and she didn't know what he planned to do. Mr. Lane went outside to lock his truck and they watched the young men walk up the sidewalk.
About 20 minutes later, she heard sirens and learned that Ms. Washington and Ms. Johnson had been shot. Ms. Green talked to the police at the scene and later went to the police station to view a live lineup. She was unable to pick anyone out but told the police that number one looked like the person who came to her door and number six sounded like him. Number one was a high school student who had volunteered to be in the lineup and number six was the defendant Fabian Harper. She explained that she was scared while she was at the police station. At a later date she viewed a videotape of the lineup at home and identified number six as the person who came to her door. She was absolutely positive. She identified the defendant in court as the person who came to her door.
John Paul Lane testified that he went home for lunch on September 5, 1990, driving his grey low-rider Isuzu pickup. There was a knock at the door and his mother answered it. He heard her talking to someone but could not hear what they were saying. His mother asked him if he knew a particular female and he said that he did not. After his mother shut the screen door, she told him to go lock his truck. He went out to lock the truck and saw a tall, young, black man wearing jeans and a green shirt, standing across the street from the house. He saw another young, black man wearing jeans and a plaid or multi-colored shirt over a t-shirt meet up with the one in the green shirt. They walked toward Jewella Avenue.
He talked to the police that day but never went to the police station. The police brought a video tape of a lineup to the house but he could not pick anyone out. He also *542 saw a photographic lineup and had an inkling it was number six but could not make a positive identification. Later, at a pretrial hearing, he was sitting in court and several prisoners were brought in. He saw the defendant standing up front with his lawyer and knew that he was the man he had seen standing across from his house. He does not remember any names being called prior to his identification of the defendant at the hearing. He also identified the defendant in court as the man wearing the green shirt that he saw across the street from his mother's house.
Darren Sloan testified that on September 5, 1990, he was working on his car in his grandmother's yard, when his brother, Eric Sloan, and the defendant came by. Darren was going to take an application to the McDonald's at the corner of Greenwood and Jewella, when Eric and the defendant decided to walk with him.
As they walked, he heard the defendant state that he was going to get some money and a truck that day. Darren told the defendant not to talk about that because he and Eric had just gotten out of jail. (Eric had been arrested for stealing the defendant's VCR.) He saw the .22 in the defendant's back pocket but did not say anything about it. Darren Sloan denied that he had ever owned the gun, but stated that he had spray painted it gold for the defendant. They stopped at the Big State Pawnshop on Greenwood Road. While he was looking at speakers, the defendant and Eric left. After leaving the pawn shop, he walked over to the County Market store and asked some people from the neighborhood if they had seen Eric, then got a soft drink from a gas station, and went home.
The defendant came over later and said something about "your brother shouldn't have did it." Eric came by to get a change of clothes and the defendant did not say anything else. Later that night, Detective Price came to talk to his grandmother and take her to the police station. The next morning Darren and his aunt, Jonetta Kennedy, went to the police station. That is when he learned Eric had been arrested for murder.
The testimony of Corporal M.A. Price, Lieutenant D.E. Stevens, and Captain Pittman of the Shreveport Police Department included the following. Corporal Price and Lieutenant Stevens interviewed Eric Sloan after his arrest on September 5, 1990. At first Eric told them different stories, but eventually told them that the defendant had shot the victims. After talking to Eric, they located the purse behind the Delta gas station on Jewella Avenue, about 5 or 6 blocks north of Greenwood Road. A red and blue plaid, short sleeved shirt was recovered from a path used by people who live on the south side of I-20 to get to the shopping centers on the north side of I-20. Eric Sloan testified that he went home along the path after the shooting. A gun powder residue test performed on Eric Sloan approximately 22 hours after the shooting was negative.
Based upon information provided by Eric Sloan, the defendant was arrested at his home on September 6, 1990. The police searched his home pursuant to a warrant and collected 6 spent .22-shell casings from his bedroom. Since Eric had stated that the defendant had thrown the shells over the fence into the yard of the residence next door, they did a brief search of the yard next door. The house was vacant, the back yard was knee deep in grass and there was trash everywhere. There was also standing sewage in the yard. They did not recover any evidence connected to the shooting from the yard at that time.
On November 1, 1990, however, the police were informed by Darren Sloan that the gun was wrapped in a green shirt in the back yard of the residence at 3844 Tate, the same address searched earlier. Darren Sloan also stated that there were some white shorts by a tree in the yard. The house had been rented since the defendant's arrest and Corporal Price was given permission to search the yard by the 14-year-old son of the tenant. The tenant arrived after the search and also signed a consent form. Price found a pair of white shorts near a green shirt wrapped around a .22 revolver.
Although the yard had been mowed and cleaned up since September 6, 1990, he had *543 to search for a period of time before he found the gun. The shorts were in plain view by a tree. The gun appeared to have been there for awhile. The part of the yard where the green shirt and gun were found was along the fence where there was still some overgrowth or bushes. The gun was corroded from being left outside.

DISCUSSION

ASSIGNMENT OF ERROR NUMBER 1: The trial court erred in denying the Motion and Supplemental Motion for Post-Judgment Verdict of Acquittal because the evidence was insufficient to support the conviction.
Following his trial, the defendant filed a motion for post-verdict judgment of acquittal and a supplemental motion for post-verdict judgment of acquittal, asserting that the evidence was insufficient to support his conviction. In this assignment, the defendant contends that the trial court erred in denying the motion.
A post-verdict judgment of acquittal shall be granted only if the court finds the evidence, viewed in the light most favorable to the state, does not reasonably permit a finding of guilty. LSA-C.Cr.P. Art. 821. The proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cotton, 25,940 (La.App.2d Cir. 03/30/94), 634 So.2d 937.
The Jackson standard applies to both direct and circumstantial evidence. Direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly, 468 So.2d 1154 (La. 1985); State v. Turner, 591 So.2d 391 (La. App.2d Cir.1991), writ denied, 597 So.2d 1027 (La.1992). For circumstantial evidence to convict, it must exclude every reasonable hypotheses of innocence. LSA-R.S. 15:438.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson, supra, and does not extend to credibility determinations made by the trier of fact. LSA-Const. Art. 5, Sec. 5(C); State v. McCray, 621 So.2d 94 (La.App.2d Cir.1993). It is the function of the jury to assess credibility and resolve conflicting testimony. In the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the jury, is sufficient support for the requisite factual conclusion. State v. Combs, 600 So.2d 751 (La.App.2d Cir.1992), writ denied, 604 So.2d 973 (La.1992).
Pursuant to LSA-R.S. 14.30.1(A), the definition of second degree murder includes the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of armed robbery. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. LSA-R.S. 14:64. Those persons "concerned" in the commission of the offense, whether they have aided and abetted, counseled or procured another person to commit the prohibited act, are principals in that offense. LSA-R.S. 14:24; State v. Long, 94-0092 (La. 09/16/94) 643 So.2d 132.
The evidence clearly established that Ms. Johnson was shot and killed during an armed robbery. Ms. Washington testified that the perpetrator took Ms. Johnson's purse. Willie Wesley stated that immediately after hearing the shots, she saw a man run across her yard carrying a gun and a purse. Eric Sloan had Ms. Johnson's check in his possession when arrested and took the officers to the gas station where the purse was discarded. Dr. George McCormick testified that Ms. Johnson died from a gunshot wound to the right side of the head.
*544 Eric Sloan testified regarding the defendant's involvement in the plan to rob the victims. This testimony is corroborated by other evidence. Eric's statement that he and the defendant had an agreement to get a car and money is supported by Darren Sloan's testimony that the defendant stated that he was going to get a car and money that day. He also stated that the gold painted gun belonged to the defendant and that the defendant had it with him as they walked to the pawn shop.
Eric's testimony that they walked down Woodrow Street because the defendant had seen a grey low-rider truck and decided to take it is supported by John Lane's testimony that he had driven a grey low-rider truck down Jewella Avenue, turning on Woodrow Street just before he and his mother heard the knock at the door. Eric's testimony that the defendant went to the door of the house where the grey truck was parked to attempt to take the truck is supported by Wanda Green's identification of the defendant as the person who came to her door sweating profusely and appearing nervous.
Additionally, Ms. Green's testimony regarding the defendant's conduct at her door was substantially identical to Ms. Washington's testimony regarding the initial conduct of the person who came to Ms. Johnson's door. Mr. Lane stated that he saw the defendant walk down the street toward Ms. Johnson's house with a man in a red plaid shirt.
When viewed in the light most favorable to the state, this evidence establishes that the defendant was a principal in the armed robbery of the victims. Both Eric Sloan and the defendant planned to take a car and money by force. The defendant provided the weapon, intended to participate in the crime, and was identified with the man in the red plaid shirt on Woodrow Street shortly before the shooting.
The jury's verdict of guilty of second degree murder and not guilty of attempted second degree murder is consistent with a finding that the defendant acted as a principal in the armed robbery, but did not necessarily shoot the victims. Therefore, irrespective of whether or not the defendant shot the victim, the evidence clearly demonstrates that he was "concerned" in the armed robbery of the victims and, is therefore a principal in the offense of second degree murder. This evidence is sufficient to support his conviction.

ASSIGNMENT OF ERROR NO. 2: The trial court erred in denying the Motion and Supplemental Motion for New Trial because the defendant's conviction for second degree murder is gravely unjust and the ends of justice will be served by granting him a new trial.
The defendant filed a motion and supplemental motion for new trial, which the trial court denied, in which he asserted that the verdict was unjust, the evidence was insufficient, and the verdict was contrary to the law and the evidence pursuant to LSA-C.Cr.P. Art. 851(1) and (5). Defendant argues error in the denial of the motion for new trial.
A denial of a motion for new trial based on LSA-C.Cr.P. Art. 851(1) or (5) is not subject to review on appeal. State v. Bartley, 329 So.2d 431 (La.1976); State v. Combs, 600 So.2d 751 (La.App.2d Cir.1993), writ denied, 604 So.2d 973 (La.1993); State v. Tucker, 604 So.2d 600 (La.App.2d Cir.1992), modified on other grounds, 626 So.2d 707 (La.1993). Accordingly, this assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER 3: The trial court erred in allowing the hearsay testimony of Detectives Gary Pittman and D.E. Stevens concerning the video lineup identification of defendant by Pariss Washington while she was in the hospital.

ASSIGNMENT OF ERROR NUMBER 4: The trial court erred in denying the Motion to Suppress Lineup Identification of defendant by Pariss Washington.
In these assignments, the defendant asserts that the trial court erred by denying his motion to suppress Pariss Washington's lineup identification and allowing Captain Pittman and Lieutenant Stevens to testify concerning the identification. The defendant contends that this evidence should have been *545 suppressed because: (a) the testimony of the officers was hearsay; and (b) the lineup was suggestive.
On September 7, 1990, while Ms. Washington was in the hospital recovering from her injury, Captain Pittman and Lieutenant Stevens asked her to look at video of a lineup which included the defendant and Eric Sloan. The defendant was number six and Eric Sloan was number three. Ms. Washington immediately identified the defendant as the person who shot her and Ms. Johnson.
However, at a preliminary hearing on October 27, 1993, she looked at the same video five or six times and said that number three, Eric Sloan, may have been the person who shot her and Ms. Johnson.
At trial, Ms. Washington testified that at the hospital she had positively identified number six as the perpetrator. Upon questioning, she admitted that at the preliminary hearing she chose number three, Eric Sloan, as the perpetrator after viewing the video five or six times. At the time of trial she stated that she could not identify the defendant.
After Ms. Washington's testimony and over the defendant's objection, Detective Pittman and Officer Stevens testified that they had shown the video lineup to Ms. Washington and she had positively identified the defendant as being the person who shot Ms. Johnson and herself.

(A) Hearsay.
The defendant asserts that the testimony of officers Pittman and Stevens indicating Ms. Washington's prior identification of the defendant was inadmissible hearsay. We find no merit to this assignment of error.
LSA-C.E. 801(C) defines hearsay as a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. LSA-C.C. 801(C). A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is one of identification of a person made after perceiving him and which confirms the testimony of the declarant that he made an identification. LSA-C.E. 801(D)(1)(c).
The officer's testimony clearly falls within the exception set forth in LSA-C.E. 801(D)(1)(c).[1] The testimony of the police officers is nothing more than cumulative evidence of Ms. Washington's testimony. Further, the jury heard evidence at trial in the defendant's favor, i.e. that he was not the perpetrator, and therefore could weigh that testimony against the evidence of prior identification. Finally, the entire issue of photographic identification involved the issue of whether or not the defendant or his accomplice was the shooter. As previously noted in this opinion, that issue is unnecessary to a finding of guilt of the defendant as a principal to second degree murder under the instant facts. Therefore, this argument lacks merit.

(B) Suggestive Lineup.
The defendant also contends that the lineup was suggestive because he was standing slightly behind the other five persons. In attempting to suppress a pretrial identification, the defendant must first show a suggestive identification procedure and then demonstrate a likelihood of misidentification. State v. Dyer, 621 So.2d 51 (La. App.2d Cir.1993), writ denied, 626 So.2d 1178 (La.1993). A lineup is unduly suggestive if the identification procedure focuses attention on the defendant. State v. Savage, 621 So.2d 641 (La.App.2d Cir.1993), writ denied, 642 So.2d 1282 (La.1994). The lineup consisted of the defendant, Eric Sloan, and four high school students who volunteered. The persons in the lineup appear to be of similar age, complexion, weight, and appearance. They are dressed alike and have similar haircuts. Although the defendant appears to be slouching, there does not appear to be anything in the lineup procedure that focuses attention *546 on the defendant. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER 5: The trial court erred in denying the Motion to Suppress the Evidence Seized Pursuant to the Search Warrant.
In this assignment, the defendant asserts that the trial court erred in denying his motion to suppress the evidence seized (a) from his residence pursuant to the search warrant; and (b) the gun and clothing seized from the search of the back yard of the residence next door to his house.

(A) Search of Defendant's Residence.
The defendant asserts that the search warrant does not contain probable cause to justify the issuance of a search warrant. He argues that the affidavit for a search warrant fails to articulate any reasonable belief that anything would be found inside the residence other than the defendant.
A search warrant may issue only upon probable cause established to the satisfaction of the judge by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant. LSA-C.Cr.P. Art. 162. A search warrant shall particularly describe the person or place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search or seizure.
Probable cause exists when the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient to support a reasonable belief that an offense has been committed and that evidence or contraband may be found at the place to be searched. An issuing magistrate must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place. The task of the reviewing court is simply to insure that the magistrate had a substantial basis for concluding that probable cause for a search warrant existed. State v. Davis, 92-1623 (La. 05/23/94), 637 So.2d 1012, cert. denied, ___ U.S. ___, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); State v. McLemore, 26,106 (La.App.2d Cir. 06/24/94), 640 So.2d 847, writ denied, 94-1908 (La. 12/9/94), 647 So.2d 1107.
In Davis, supra, the affiant detective recounted the facts of the robbery and shooting and noted that an acquaintance of the defendant who had been with him at the time of the offense had informed the police that the defendant was the shooter. The affidavit also stated that a witness had identified the defendant's car and the defendant from a photograph. The affidavit specified the items to be searched including clothing worn by the defendant at the time of the offense and the gun. The court held that the information in the affidavit provided the magistrate with a substantial basis for authorizing each search warrant.
In the present case, the Affidavit for Search Warrant (State's Exhibit No. 7), signed by Sergeant D.E. Stevens, states:
That he has good reason to believe that located on/in the person/premises described as follows: Fabian E. Harper B/M 16 D.O.B. 9-8-73 and 3848 Tate ... the following property which is evidence of the commission of an offense ...: 1-.22 caliber pistol revolver with white grips and possible gold paint, 1-reddish/rust colored shirtplaid typewith white, 1-dark colored baseball cap, 1-dark colored hat with a brim, 1-dark colored pants, tennis shoes belonging to Fabian Harper, gunshot residue.
....
Salone advsied [sic] Affiant that he seen Fabian Harper with the gun at his residence shortly after the shooting. Salone also advised Affiant that he seen Fabian take four spent shell [sic] from the gun and throw them in a vacant lot next door to his (Fabian) residence. Salone advised Affiant that Fabian then took the weapon inside the residence where it is normally kept. Affiant has reason to believe that the gun may still be inside Fabian residence 3848 Tate.
The affidavit also states the circumstances of the shooting, Eric Sloan's arrest and the information provided by Eric Sloan regarding the shooting. While admissions of *547 crime do not always lend credibility to contemporaneous or later accusations of another, they may sometimes be relied upon as a means of showing that an informer's information is reliable. State v. Mosley, 412 So.2d 527 (La.1982). Thus, Eric Sloan's detailed information regarding the shooting which was consistent with the testimony of other witness was sufficient to support a reasonable belief that evidence could be found at the defendant's home. Consequently, the affidavit contained probable cause.

(B) Search of Back Yard of Residence Next Door.
The defendant also contends that the police should have gotten a search warrant before searching the backyard of the residence next door to the defendant's house after Darren Sloan informed them that the gun could be found there. At the hearing on the motion to suppress, Lieutenant Stevens testified that the 14-year-old child of the tenant consented to the search of the yard. He did not retrieve any of the items until the child's mother came home and signed the consent form. The trial court held that the mother's consent validated the consent given by the child. The defendant asserts that the search was illegal because the 14-year-old son of the tenant had no capacity to consent to the search of the backyard and the mother's consent did not cure the illegal search.
This argument lacks merit. The tenant's consent to the search when she arrived home rehabilitated the prior warrantless search. State v. Henry, 440 So.2d 872 (La.App.2d Cir.1983). In Henry, supra, several police officers went to a residence owned by the defendant's girlfriend. When no one was home, one of the officers entered the house and observed items taken in a burglary. Thereafter, the owner of the residence arrived home and said that the items were not there when she went to work that morning. She signed a consent form and the items were seized. The defendant contended that the original warrantless entry and resulting search were illegal. This court held that the consent signed after the entry waived the warrant requirement and purged the initial search of the primary taint.
Further, the defendant had no expectation of privacy in the backyard of the residence next door. The test for determining whether one has a reasonable expectation of privacy which is constitutionally protected is not only whether the person had an actual or subjective expectation of privacy, but also whether expectation is also of a type which society at large is prepared to recognize as being reasonable. LSA-Const. Art. I, Sec. 5; State v. Ragsdale, 381 So.2d 492 (La.1980). In Henry, supra at 874, this court held that the defendant had no right to expectation of privacy in the residence of his girlfriend where he stayed occasionally but did not live.
Finally, the property seized had been abandoned. When property has been abandoned, a person's property interest in it lapses, and there is no further reasonable expectation of privacy, so property may be searched and seized without normally requiring a search warrant. State v. Kelly, 576 So.2d 111 (La.App.2d Cir.1991), writ denied, 580 So.2d 666 (La.1991). This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER 6: The trial court erred in denying the Motion to Reconsider Sentence.

ASSIGNMENT OF ERROR NUMBER 7: The trial court imposed an excessive sentence.
In these assignments, the defendant asserts that the sentence imposed by the trial court, although mandatory, is excessive, and cruel and unusual punishment. Defendant argues that it is not fair in this case, where he was convicted as a principal and received a life sentence without benefit of parole, probation, or suspension of sentence, while the person who actually shot the victims was allowed to plead guilty to a lesser offense and received a sentence of seven years at hard labor.
The penalty for second degree murder is life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14.30.1. The Louisiana Supreme Court has consistently held that a mandatory sentence of life imprisonment for second degree murder does not constitute cruel and unusual punishment. *548 State v. Landry, 388 So.2d 699 (La.1980), cert. denied, 450 U.S. 968, 101 S.Ct. 1487, 67 L.Ed.2d 618 (1981); State v. Daniel, 378 So.2d 1361 (La.1979); State v. Graham, 422 So.2d 123 (La.1982), appeal dismissed, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983).
Further, the supreme court has stated:
There is no injustice in punishing one of two guilty principals when the jury has possibly miscarried justice by acquitting the other guilty principal on the basis of mistake, compromise, lenity or nullification. At most, there is only the illusory appearance of injustice which is nothing more than intellectual discomfort with an imperfect system of criminal justice.
State v. Irvine, 535 So.2d 365, 369 (La.1989).
These assignments lack merit.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] This article is consistent with the jurisprudence prior to the enactment of the Louisiana Code of Evidence generally holding that prior statements of identification made by a testifying witness are not hearsay evidence. State v. Jones, 610 So.2d 782 (La.1992); State v. Baker, 582 So.2d 1320 (La.App.4th Cir.1991), writ denied, 590 So.2d 1197 (La.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 62, 121 L.Ed.2d 30 (1992).