643 So.2d 132 (1994)
STATE of Louisiana
v.
Kenneth LONG and Shirley Long.
No. 94-K-0092.
Supreme Court of Louisiana.
September 16, 1994.
Certiorari Denied December 12, 1994.
Elizabeth L. Hall, Joseph D. Lewis, Baton Rouge, for applicant.
Kenneth Long, pro se.
Richard P. Ieyoub, Atty. Gen., Charles F. Wagner, Dist. Atty., Clifford R. Strider, III, *133 Kathrine S. Williamson, Alexandria, for respondent.
Certiorari Denied December 12, 1994. See 115 S.Ct. 676.
PER CURIAM:[*]
The relator and her husband were charged together by bill of information with arson with the intent to defraud in violation of La.R.S. 14:53. They waived trial by jury and were found guilty as charged by the court, which thereafter sentenced them both to five months at hard labor. The court suspended the sentences and placed the Longs on active probation for five years. On appeal, the Third Circuit affirmed the convictions and sentences, specifically rejecting the claims of both Longs that the state's circumstantial evidence did not exclude every reasonable hypothesis of innocence. State v. Long, 625 So.2d 377 (3rd Cir.1993). We granted the application of Shirley Long only to review the correctness of that ruling, 637 So.2d 486 (La.1994), and now reverse.
In the early morning hours of Monday, November 20, 1989, fire gutted the relator's home in Woodworth, Louisiana. The blaze claimed no lives as the Longs had sought shelter for themselves and their two children in the nearby home of the defendant's mother, Marie Tuneberg, five days earlier, after reporting a bomb threat recorded on their telephone answering machine to the Woodworth police. The Longs had spent the intervening days travelling back and forth between the two houses, but sleeping in the Tuneberg household and awaiting the results of a vote on a school bond proposal that Saturday. The Longs suggested to the police that controversy over that bond proposal, for which the relator had actively campaigned as the spokesperson for the local P.T.A., may have led to the bomb threat.
The fire, which erupted less than two days after the bond issue passed, began in the utility room of the home and along the wall outside the master bedroom. An unidentified motorist alerted Woodworth Police Chief Calvin Watts at 3:40 a.m., fifteen minutes after Watts had stopped and cautioned Kenneth Long for speeding. The stop occurred approximately one mile from the Long household. Kenneth Long was coming from the general direction of his home, and he travelled the same route every morning on his way to Lecompte, Louisiana, to pick up the newspapers he delivered to supplement income derived from his construction business, K & B Steel Builders Inc., operated out of his home.
The multiple points of the fire's origin, and the intensity of the blaze which took an unusual amount of water to quench, immediately indicated to the Woodworth Volunteer Fire Department that arson was involved, and outside experts were summoned to the scene. The experts established that the fire in the utility room had been set from the inside by someone splashing flammable liquid, such as gasoline or kerosene, on the wall. Woodworth firemen had found all of the doors in the home closed with deadbolt locks, and all the windows closed and locked with one exception. The window in the utility room had apparently exploded outward from the heat of the blaze and its fragments were found outside on the ground. That evidence discounted any possibility that a bomb or other incendiary device had been thrown through the window into the house, and the Longs, who freely acknowledged that they alone had the keys to their home, became the focus of the arson investigation.
On the afternoon of the fire, the relator gave a statement to Charlene Bulliard, a senior claim representative for Hanover Insurance Co., which carried the policy on the home and its contents. Relator told Bulliard that the family was not in financial difficulties but had been forced to revamp their finances because she had left the law firm where she had worked as a paralegal for many years that June to set up her own business as a free-lance paralegal. She had also purchased a franchise to sell motivational tapes from her home. In fact, as made clear by the documents produced at a deposition of the defendant conducted by lawyers *134 for Hanover Insurance on January 25, 1990, mounting debt plagued the Long family. In the summer of 1989, relator and her husband had explored putting K & B Steel Builders Inc. through bankruptcy to discharge the numerous lawsuits filed against it. They had also sought the help of Family Debt Counselling Service in August of 1989 with regard to their personal finances. As part of that program, the Longs cut up their credit cards and agreed to a plan which called for payment of 60 per cent of the monthly debts of the nearly thirty creditors listed, or a total of 2,770 dollars a month, based on the Long's estimate that their monthly net income was approximately 5,000 dollars, enough to cover payments on their first and second home mortgages as well. The Longs had, however, failed to list the second mortgage with Family Debt, or disclose a 24,000 dollar promissory note signed by relator with her former law firm. At the time they entered the debt management program, the Longs were running the paper route, K & B Steel Builders, Inc., which had lost its state license to contract for jobs over 50,000 dollars, and the defendant's free-lance paralegal business, including the motivational tape franchise, out of the family home, but generating little apparent monthly income.
The Longs met their monthly payment to Family Debt on September 10, 1989, and October 10, 1989. They were late with the November payment and given an extension until November 20, 1989, the day of the fire. According to the relator's deposition introduced at trial, the Longs had planned to use 7,800 dollars in cash kept in their home to stay afloat but informed their insurer that they had found all of the currency missing after the fire and claimed that cash as part of the proof of loss submitted to Hanover Insurance.
The common law rule that a husband and wife could not make up the two parties necessary to constitute a conspiracy, based on the legal fiction that marriage had made them a single person, has long since given way to modern principles of individual accountability. See 1 W. LaFave, Substantive Criminal Law (1986), § 6.5. A wife may therefore expose herself to criminal liability by embarking on a concerted course of action with her husband to commit prohibited acts, but ratification by one spouse of the fraudulent acts of the other spouse which have inured to the benefit of both remains a civil, not criminal, concept. See Annot. Ratification of Spouse's Fraudulent Acts, 82 A.L.R.3d 625 (1978). In Louisiana, only those persons "concerned" in the commission of the offense, whether they have aided and abetted, counselled or procured another person to commit the prohibited act, are principals in that offense. La.R.S. 14:25. Moreover, because this Court will not speculate on the extent to which one spouse "should have known what was going on in his own home...," State v. Meredith, 403 So.2d 712, 715 (La.1982), a trier-of-fact's determination that a wife aided and abetted the commission of the charged offense by her husband must rest upon more than mere speculation based upon guilt by association arising from relational status. Cf., State v. Pierre, 631 So.2d 427, 429 (La.1994); State v. Schwander, 345 So.2d 1173, 1175 (La.1977); State v. Williams, 310 So.2d 513, 515 (La.1975).
In this case, a rational trier of fact could reasonably reject the hypothesis that the Long residence had been firebombed in the controversy over the school bond issue but could only speculate whether relator had played any affirmative role in the arson of her own home. Cf., State v. Lubrano, 563 So.2d 847 (La.1990). The state had no direct evidence that relator had encouraged or procured her husband to commit that act, or that she had helped him set the fires. The defendant had called her insurance agent, Diane Gueringer, in September of 1989 to inquire about coverage under her homeowner's policy of the materials and revenue connected with the various businesses run out of her home. Gueringer testified that the call was a routine matter, however, and that after checking with the company carrying the policy, she informed the defendant that 250 dollars on business personal property was "all we would cover...." The state had no evidentiary basis for connecting the bomb threat recorded on the Long's telephone answering service to the relator, who told the police that she heard the call as it *135 came into the machine and then gave the tape to Woodworth police officer Gil Benoit. The officer testified at trial that the tape sounded to him "like a kid trying to impersonate an adult," and he treated the call as a prank. Benoit's response provided a rational basis for why the relator might remove her family to the safety of her mother's home to guard against an even remote possibility of danger while leaving the bulk of their personal possessions behind in the home.
Relator had misrepresented the state of the family's finances to Charlene Bulliard in her statement of November 20, 1989, and from that discrepancy, a rational factfinder could infer that she had been attempting to conceal evidence of motive, a relevant circumstance in the proof of any offense. State v. Williams, 633 So.2d 147 (La.1994). Nevertheless, relator subsequently brought with her to the deposition on January 25, 1990, numerous documents which graphically exposed the truth of the matter. Even then, relator spoke of how the family was "making it" with the purchase of her motivational tapes franchise and by going "strictly to a cash basis, so nothing else was being charged... [and] Kenneth still had K & B Steel Builders going...." Relator's conflicting accounts of her family's finances did not constitute affirmative substantive evidence that she aided and abetted the act charged against her, State v. Williams, supra; State v. Savoy, 418 So.2d 547 (La.1982), in part because they reflected not only a lack of candor but the same inability to come to grips with the realities of a situation which had led the family into its financial straits in the first place.
Relator acknowledged in her deposition of January 25, 1990, that she and Kenneth Long split the bookkeeping for the family. A reasonable trier-of-fact could conclude that she was therefore fully aware of her family's financial problems and of the benefit that would accrue from collecting on the insurance which covered the home and its contents to pay off the mortgages, obtain clear title to the land, and satisfy at least some of the mounting family debt. Nevertheless, even when it is otherwise "factually peculiar to the victim and the charged crime," State v. Sutfield, 354 So.2d 1334, 1337 (La.1978), motive cannot alone provide the basis for determining that one spouse has "concerned" himself or herself in the fraudulent acts of the other spouse simply by reason of their common interests arising from their relational status. The defendant's conviction and sentence are reversed and she is ordered discharged from state custody as to this charge.
CONVICTION REVERSED: DEFENDANT DISCHARGED FROM CUSTODY.
NOTES
[*] Judge William Norris, III, Court of Appeal, Second Circuit, sitting by assignment in place of Justice James L. Dennis; Judge Felicia Toney Williams, Court of Appeal, Second Circuit, participating as an Associate Justice Pro Tempore, effective September 1, 1994. Watson, J., not on panel. Rule IV, Part 2, § 3.