748 So.2d 1 (1999)
STATE of Louisiana, Appellee,
v.
Judy DURHAM, Appellant.
No. 32,154-KA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1999.
Rehearing Denied September 16, 1999.
Sutton & Sutton, Bobby D. Sutton, Sr., Shreveport, Counsel for Appellant Bobby D. Sutton, Jr.
*2 Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Hugo A. Holland, Assistant District Attorney, Counsel for Appellee.
Before BROWN, WILLIAMS and DREW, JJ.
DREW, J.
Indicted on two counts of forgery, Judy Durham was found guilty by a jury of attempted forgery on Count One and guilty as charged on Count Two. Durham was sentenced to two years at hard labor and fined $1,500 on the first count, and sentenced to three years at hard labor and fined $3,000 on the second count. The prison sentences, to run concurrently, were suspended and Durham was placed on supervised probation for three years.
The special conditions of Durham's probation are that she: (i) make restitution of $79,541.07 to the Caddo Parish Commission for the salary and benefits she received while she was suspended with pay; (ii) make restitution of $6,928 to the Caddo Parish Commission for the vacation pay she received since her indictment; (iii) pay $1,609.44 in court costs; (iv) pay a monthly supervision fee of $50; and (iv) serve 15 days in the Caddo Parish Correction Center. The restitution was ordered to be paid in equal monthly installments within 12 months, beginning August 1, 1998, or within 30 days from the date the conviction and sentence become final.
Durham appeals her convictions and sentence, raising 14 assignments of error. Finding the evidence presented at trial to be insufficient under Jackson v. Virginia to convict on either count, we reverse Durham's conviction on both counts.

FACTS

Background
Johnny Reid, who testified pursuant to a grant of immunity, was elected to the Caddo Parish Commission in 1991 and eventually became the President of the Commission. Reid, not knowing Durham at the time, voted for her appointment as Administrator based on the recommendation of another Commissioner. Reid developed a close working relationship with Durham, having contact with her on almost a daily basis, which was more frequently than the other Commissioners. Reid's four-year term in office expired on December 31, 1995.
Reid was the owner of several area daiquiri shops. In the late 1980's, Shreveport passed an ordinance making it illegal to serve alcoholic beverages to anyone under the age of 21. After one of Reid's employees was cited for violating the local ordinance, Reid contacted the Beer Industry League ("League"), a trade organization which lobbies the state legislature. The League is run by George Brown and employs Charles Tapp as a contract employee. The League decided to take up the case involving Reid's employee as a test case and paid an attorney $28,000 to represent Reid's employee.
Raymond Holloway was the Commissioner of the Louisiana Alcohol Beverage Control Board ("ABC"), which has an administrative section and an enforcement section. ABC is responsible for the collection and issuance of alcohol licenses to retail outlets, wholesalers and buyers. ABC also regulates the alcohol industry to ensure that state laws are being followed. Holloway was appointed to this position by Governor Edwin Edwards after Holloway served as Edwards' security director during his 1991 campaign for governor.
Sometime later, Reid, Durham, Brown, Tapp and Holloway all attended a meeting at Northwood Country Club concerning the liquor license problems of the club, which was in Reid's District. Holloway was still with ABC at the time.
Holloway was asked by Edwards to resign in November of 1994 after some unfavorable newspaper stories were published. Edwards contacted George Brown to enlist his help in encouraging Holloway to resign. *3 Holloway subsequently resigned his position with ABC.

The Job Search
According to Holloway, State Representative "Hoppy" Hopkins suggested that he contact Reid about possible employment. Tapp later called Reid on behalf of Holloway to discuss Holloway's situation. When Reid asked if there was anything he could do to help Holloway, Tapp responded that he could help if there were any jobs in North Louisiana. Reid told Tapp that he would do what he could to help Holloway. Reid then called Billy Hanna, gave him Holloway's phone number and asked him to contact Holloway so that he could apply for employment with Caddo Parish.
Hanna has served in a variety of capacities for Caddo Parish and at the time of trial, he was an Assistant Administrator. When he spoke to Reid over the phone regarding Holloway, Hanna was Director of Buildings and Grounds for the Parish. Hanna, who is a former mayor of Shreveport, has known Durham for over 20 years. Durham worked in Hanna's mayoral administration.
When Hanna spoke with Holloway over the phone, Hanna offered to send him an application, but Holloway insisted that he come to Shreveport and pick one up himself. Upon Holloway's arrival in Shreveport, Hanna took him to Human Resources to get an application. Holloway submitted his application and resume, but not for any particular job. He also told Hanna that he could only take a job paying a salary of at least $24,000. Holloway later sent an updated resume for the position of purchasing agent in the Finance Department to Sharon Doyle on March 13, 1995. Angela Terry, who worked in the Department of Human Resources, wrote "Submitted by S.A. Doyle" next to Holloway's name on the list of applicants when his application came in.
Steve Primos is a former Assistant Administrator. Primos remembered hearing a "rumor that someone was coming up from Baton Rouge to take an administrative position." He feared it was someone to replace him. Hugh Walmsley, Director of Finance for Caddo Parish, related that Primos had told him one evening before the Buyer position had even been posted that it would in all likelihood be filled by the former Head of ABC.

The Hiring Process
Ann Roberts Stanton was the Assistant Director of Finance for Caddo Parish. She began working for the Parish in May of 1994, and her immediate boss was Walmsley. The only hiring she was ever involved in was Holloway's. Walmsley asked Stanton to look over the applications for the Buyer position and participate in the scoring of the applications. He testified that he did not want to waste his time if the hiring would be done for political purposes. Stanton reviewed the applications and then got together with Doyle, who scored the applications on behalf of Human Resources and instructed Stanton on how to score them. Stanton admitted that she did not know what she was doing when she did the scoring.
After receiving the applications but prior to scoring them, Stanton received a telephone call from Reid. Reid told Stanton to pay close attention to Holloway's application. When she questioned Holloway's qualifications, Reid told her that she never knew who could help her out. Later, prior to the interviews, she, Walmsley, Durham and Doyle were in Durham's office discussing the Buyer position when Durham said that they needed to hire a white male.
Stanton and Doyle scored the applications pursuant to a set of criteria which assigned a score value of three to five points for education and an additional three to five points for related experience, for a possible maximum score of ten. An applicant was required to have either education or related experience, but not both. A "Degree" was given a score value of five. Holloway was only given a total score of four, despite his having a degree in law *4 enforcement. Doyle next prepared a "Certified List of Eligibles" which listed the names of the 11 applicants who received a score. Of those applicants on the certified list, one received a 10, one received an 8, six applicants received a 5, one applicant received a 4, and two applicants received a 3. The certified list was issued on March 17, 1995.
The day the interviews began, Stanton encountered Durham and Reid in a hallway. Durham told Stanton that she heard that they were interviewing for the Buyer position and asked if Stanton knew who Durham's choice was. Stanton thought Durham meant Holloway was her choice based on the conversation she had with Reid, the fact Durham and Reid were together at the time and because she thought Reid and Durham ran the Commission together. Stanton feared that she would be fired if Holloway was not hired. Stanton was apparently not the only one subjected to pressure, as Walmsley claimed that he received a memo from Purchasing Agent Archie Hall stating that he preferred a white male.
The interview team, appointed by Durham, consisted of Stanton, Walmsley, Cheryl Rambo and Archie Hall. The interview team was then divided into two groups, one being composed of Stanton and Rambo and the other of Walmsley and Hall. The interviews were conducted over two days, March 27 and 28, 1995, with each candidate being interviewed by both interview groups. As soon as the interview team came together to discuss the results of the interviews, Hall immediately stated that Holloway was at the top of his list. After serious deliberations, the team was at a standstill, with Stanton and Hall supporting Holloway, while Walmsley and Rambo were supporting another candidate. In order to break the tie, Walmsley finally agreed that Hall should make the decision because Holloway would have to work under him.

Salary Negotiation
Walmsley then went to Durham with the interview team's list ranking Holloway first of three candidates. He took this list to Durham for a decision based on the interview team's recommendation. After Walmsley provided Durham with a brief description of each candidate, Durham decided to hire Holloway. Durham instructed Walmsley to contact the three candidates and determine their salary requirements.
When Walmsley called Holloway to offer him the position, Holloway balked at the offer after Walmsley told him the job paid $17,800. Holloway told Walmsley that Hanna had said the job paid $24,000. Walmsley reported back to Durham, and he and Durham together changed the salary range for the job in order to accommodate Holloway's salary demand. Walmsley admitted that he had seen salary negotiations during his 25 years with Caddo Parish, but never to such an extreme degree.
Holloway's starting salary was $23,845. The Buyer position had been posted with an annual salary of $15,952 to $23,719. Stanton explained that the advertised salary is misleading because the maximum salary listed on a job posting is not the maximum starting salary, but the maximum salary the position will pay once an employee has reached all the levels. Because of the salary adjustment for Holloway, the salaries of four other employees in the Finance Department needed to be increased by Walmsley and Durham. These four employees were Rambo, an accountant and two senior fiscal technicians. Rambo's salary change, effective April 2, 1995, is reflected in a Payroll Authorization Form and her Employment History Form.
A parish car assigned to the Finance Department was used by Holloway. Walmsley testified that he approved Holloway checking out a car from Fleet Services, but later learned that Holloway just kept the car. The Finance Department *5 already had another car assigned to it. Holloway also leased a house located on the property of the Caddo Detention Center. After the Finance Department's business hours, Holloway would go to businesses located in Caddo Parish to determine if they had current occupational and amusement licenses.

The Controversy Brews
At the time Holloway was hired, applications were scored pursuant to a document titled, "Application Scoring Procedure." This was put into effect in September of 1993, after Doyle became Human Resources Director. It stated, in part:
The three highest scores, including those tied at each score, will be certified for interview to the hiring authority representative. No applicant may be certified for interview with less than a satisfactory score in any of the criteria.
Doyle would have had to approve any variations from the procedure.
On February 28, 1996, there was a change in the manner in which applicants were selected to be interviewed. Now titled "Application Review Process," this document stated, "In order to qualify for an interview, the applicant must meet qualifications in each criteria." Doyle held a meeting to inform the Human Resources employees of the change. Gracie Samuels from Human Resources testified that if someone now met all of the basic qualifications, he would be put on the certified list. Doyle instructed this change to take place. Anita Parker Middleton testified that Doyle actually had her make these changes to the scoring procedure in early March of 1996, not on February 28, 1996, as the document reflects.
Commissioner Gilford Gillen was sworn into office in January 1996. Gillen explained that an orientation for new Commissioners was held in December 1995. Doyle presented a report on behalf of Human Resources at this orientation. Gillen was given a file of materials pertaining to the functions of the Human Resources Department, as well as files from the other departments. In the Human Resources file was a copy of the original application scoring procedure, which Doyle informed the new Commissioners had been in place since 1993.
On January 31, 1996, The Shreveport Times reporter Tom Saul sent a letter to the Caddo Parish Attorney requesting several public records. Saul sought:
1) The job description for the position held by Ray Holloway of the purchasing department; his date of hire; his salary history, including his starting salary and the dates and amounts of all subsequent raises; the announcement listing qualifications, experience, etc., for Holloway's job that was posted at the time he was an applicant; documentation of his qualifications for the job and a list of all others who applied and documentation for their qualifications.
2) The salary history since Jan. 1, 1992, and the date of hire for Cheryl Rambo of the purchasing department. Also include her current job description, including minimum experience and qualifications for that position.
3) The salary histories since Jan. 1, 1992, dates of hire and job descriptions for the following employees in the parish finance department: Linda Levy, Rene Cascio and Margaret Dunbar.
Anita Parker Middleton is a Human Resources Specialist. She began working in Human Resources in May 1995. Prior to that she was executive secretary to the Administrator. She recalled Doyle asking her to make significant changes to the job specifications for the position of Buyer in response to the public records request. On February 1, 1996, Doyle asked Middleton to print the job specifications for the Buyer position from her computer. While performing her assigned tasks, Middleton noticed that job specifications from the City of Shreveport for the positions of Buyer, Accountant and Fiscal Technician were coming over the fax machine. These job specifications were for the same positions *6 that had been requested by the newspaper. Middleton made a copy of the faxes before giving them to Doyle. Doyle twice brought Middleton the job specifications sheet for the Buyer position with handwritten changes on it. Middleton changed the job specifications as ordered. Doyle put the revision date on the Buyer job specifications sheet as "4/95"even though the changes were made as noted above in February 1996. The final version sent to The Times incorporated some of the language used in the job specifications faxed by the City. Middleton related that Doyle had also asked her to retrieve the original list of applicants in order to respond to the The Shreveport Times request. The words "Submitted by S.A. Doyle" appeared on the list of applicants when she gave it to Doyle, but this phrase was subsequently "whited-out." This alteration and the revised date on the Buyer job specification sheet were the subject of Count One of the indictment.
Middleton further testified that on the morning of February 8, 1996, Doyle gave her a copy of the application scoring procedure with Doyle's handwritten changes on it. Doyle instructed Middleton to make the changes on her computer disk and then give the revised form back to her. Pursuant to Durham's request, Doyle was to make a report to the Commission that afternoon regarding the hiring of Holloway. In paragraph 5(B)(5) of the application scoring procedure, Doyle had scratched out the phrase "three highest" and replaced it with "qualified" such that it would read that all qualified scores would be certified to interview. Middleton remained suspicious of Doyle's motives, so she made a copy of the form Doyle had given to her. Although Doyle asked Middleton to return the documents on which she had made the handwritten changes to the scoring procedure and the job specifications, Doyle was apparently unaware that Middleton had already made copies of them.
Middleton had saved the changes to the scoring procedure on a floppy disk. This disk disappeared on March 1, 1996. On February 29, 1996, Middleton had performed an announced job audit visit at the Caddo Parish Archives. Normally there is a follow-up unannounced job audit visit one to two weeks later. The next morning, she noticed that Hanna was conferring with Doyle. A few minutes later, Doyle appeared and told Middleton that she needed to make the unannounced job audit visit at the Archives that morning and to be back before 11:00 for a staff meeting. When Doyle returned to her office, Hanna left. Middleton did not leave for the audit immediately, so Doyle reminded her of her task and that she needed to be back in time for the staff meeting.
When Middleton reached her car, she grew suspicious, so she called Linda Levy and requested that Levy watch her desk. Levy told Rene Cascio to observe the desk and inform her if anything happened. Alerted by Cascio that someone was in Middleton's office, Levy went to a window near Middleton's office, where she witnessed Gracie Samuels and Doyle milling around Middleton's desk while searching through a computer diskette box. Levy watched as Doyle left the office with the box. Upon returning to her office, Middleton found that the floppy disk was gone. Doyle was also gone and no staff meeting was ever held that morning.
When Holloway's federal indictment on an unrelated matter became public, a controversy over Holloway's hiring began to erupt. Not only did Durham ask Doyle to give a report at the Commission meeting on the afternoon of February 8, 1996, but she also instructed Stanton to prepare a report providing information about Holloway's job. Stanton testified that Durham wanted the report to "make it sound as if Ray Holloway didn't do anything illegal." Stanton did not have any evidence that Holloway had in fact done anything illegal.
The Commission meeting was held on February 8, 1996. A videotape of the *7 meeting was filed into evidence. At this meeting, Durham handed out and read what is titled a "Special Administrator's Report." This report stated:
Based on an article by Mr. Tom Saul in The Times today, it appeared obvious to me that some of you were left with misconceptions and concerns about the hiring policies and procedures of Caddo Parish. I asked Ms. Sharon Doyle, Director of Human Resources to provide for you the hiring and selection procedures which have been in place since Ms. Doyle took over the Human Resources Department in 1993. I further asked her to evaluate the process used in the selection of Mr. Raymond Holloway as a buyer for the Parish.
The hiring and selection process was developed upon Ms. Doyle's employment with the Parish. Prior to that time, no such uniform procedures were followed in the selection of applicants. Ms. Doyle will provide the details of her investigation at the conclusion of my remarks. Further, in the absence of Mr. Walmsley, I requested that Ms. Ann Roberts, Assistant Director of Finance, provide for you the procedures which are followed by the Finance Department in collection of occupational license, amusement tax and liquor permit revenues. She will provide the details of her report following that of Ms. Doyle.
Finally, attached for your information are copies of the Parish Housing Policy which went into effect on July 1, 1993. I have spent the morning responding to the concerns of staff members regarding the inaccuracies of statements attributed to them by Mr. Saul. Based on a longstanding problem which has developed in this area, my staff has taken extraordinary measures in interviews granted to Mr. Saul. Ms. Roberts requested that Mr. Dannye Malone, the Parish Attorney, be present in her interview with Mr. Saul to serve as a witness to her statements to Mr. Saul. Ms. Doyle had Ms. Linda Brown, Assistant Director of Human Resources, present to serve as a witness to her statements to Mr. Saul. In both instances, as well as our experience in the past, not only the respondents to the questions but their witnesses have declared that statements were attributed to the respondents which they did not make.
We appreciate the opportunity to present the facts to you. We are confident that when presented with the facts, your misconceptions will be cleared up and your concerns alleviated.
Durham next presented Doyle to give her report.
Doyle provided to the Commission an inter-office memo to Durham from her dated February 8, 1996, regarding the hiring and selection for the Buyer position, with a letter accompanying the memo, dated September 8, 1993, from Doyle to all department heads, stating that the new Application Scoring Procedure is attached. The next document attached to the February 1996 memo is a copy of an Application Scoring Procedure which Doyle represented "was established in September of 1993 for classified positions." Section 5(B)(5) of this Application Scoring Procedure provides:
The qualified scores, including those tied at each score, will be certified for interview to the hiring authority representative. No applicant may be certified for interview with less than a satisfactory score in any of the criteria.
This is the scoring procedure which Doyle had Middleton create the morning the memo was distributed, which is the subject of Count Two of the indictment.
Commissioner Gillen was placed on the personnel policies committee which was investigating Holloway's hiring. Gillen requested personnel files for the prior two years, and he eventually received two large boxes of materials. Gillen did not find what he wanted, so he made another request, this time for application scoring forms and lists of eligibles. What Gillen *8 received pursuant to his second request was filed into evidence. While the scores for various positions were included in this response, the scoring procedure was not. On March 28, 1996, Doyle sent Gillen and the other members of the Personnel Committee a memo outlining the hiring process. Step 3 of the process reads, "As a result of the review, all qualified scores including tied scores or the top three scores as requested by the hiring department are referred to the hiring department for interview and final selection."
Middleton testified that she helped prepare the documents sent to Gillen. On the back of the scoring list for applicants is the scoring procedure. These were copied onto separate pages. During the process of making these copies to comply with Gillen's request, Middleton had to leave in order to pick up her child from school. When she returned to the office that evening, she witnessed Doyle going through the copies and removing the copies of the application scoring procedure.

Indictment
On June 24, 1996, Judy Durham and Sharon Doyle were charged by amended indictment with having committed forgery in violation of La. R.S. 14:72 between February 1 and February 8, 1996. This amended indictment stated, in part:

COUNT 1: SHARON DOYLE & JUDY DURHAM falsely made and altered, and were principles [sic] to the false making and altering, with intent to defraud, documents prepared and caused to be prepared for the Caddo Parish Commission's response to a public records request made by the Shreveport Times pursuant to Title 44 of the Louisiana Revised Statutes; and, issued and transferred, and were principles [sic] to the issuing and transferring, with intent to defraud, documents prepared and caused to be prepared for the Caddo Parish Commission's response to a public records request made by the Shreveport Times pursuant to Title 44 of the Louisiana Revised Statutes, said documents known by the said SHARON DOYLE & JUDY DURHAM to be forged writings; and,

COUNT 2: SHARON DOYLE & JUDY DURHAM falsely made and altered, and were principles [sic] to the false making and altering, with intent to defraud, documents prepared and caused to be prepared for the "Special Administrator's Report" and presented to a duly constituted meeting of the Commissioners of Caddo Parish; and, issued and transferred, and were principles [sic] to the issuing and transferring, with intent to defraud, documents prepared and caused to be prepared for the "Special Administrator's Report" and presented to a duly constituted meeting of the Commissioners of Caddo Parish, said documents known by the said SHARON DOYLE & JUDY DURHAM to be forged writings.

Trial
The jury heard testimony from Johnny Reid, Charles Tapp, Steve Primos, Ann Stanton, Billy Hanna, Danny Dumas, Cheryl Rambo, Gracie Samuels, Linda Levy, Linda Brown, Diedre Arinder, Raymond Holloway, Kimberly Bloomer, Angela Terry, Hugh Walmsley, Gilford Gillen and Anita Parker Middleton. The prosecution and the defense stipulated to Tom Saul's testimony regarding the public records request. The defense called no witnesses.
Johnny Reid and Raymond Holloway each provided testimony pursuant to a grant of immunity. Sharon Doyle was not tried on these charges, nor was she granted immunity. In fact, the prosecution against Doyle was dismissed by the state on September 3, 1998, exactly three months after Durham's conviction.
Durham's motions: for new trial and post-verdict judgment of acquittal were denied by the trial court.

DISCUSSION
Durham argues in her first assignment of error that the evidence is insufficient to *9 support her convictions. Durham argues in her second assignment of error that the circumstantial evidence did not exclude every reasonable hypothesis of innocence.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence, because acquittal on that assignment makes it unnecessary to review the other assignments of error. State v. Hearold, 603 So.2d 731 (La.1992).
The standard of review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
Circumstantial evidence is evidence of facts or circumstances from which one might infer or conclude, according to reason and common experience, the existence of other connected facts. State v. Bullard, 29,662 (La.App.2d Cir.9/24/97), 700 So.2d 1051. In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438 applies:
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
Regarding circumstantial evidence, this court has stated:
When circumstantial evidence forms the basis for the conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when evaluating the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia. This is not a separate test from Jackson v. Virginia, but is instead an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt.
State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, 614. (Citations omitted)
The Jackson due process standard of review does not permit an appellate court to substitute its appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. An appellate court does not assess credibility or reweigh the evidence. State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132.
La. R.S. 14:72 defines the crime of forgery as:
Forgery is the false making or altering, with intent to defraud, of any signature to, or any part of, any writing purporting to have legal efficacy.
Issuing or transferring, with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute forgery.
It is required that the "forgery be committed with the specific intent to defraud." State v. Wade, 375 So.2d 97 (La.1979), cert. denied, 445 U.S. 971, 100 S.Ct. 1665, 64 L.Ed.2d 249 (1980). Our emphasis. "An essential ingredient of the crime of forgery is specific intent...." State v. Jackson, 258 La. 632, 247 So.2d 558 (1971). See also the Reporter's Comment to La. R.S. 14:11, which states, in part:
... in some crimes the production of certain consequences plus a specific intent *10 to produce or accomplish some prescribed consequences is necessary (for example, "Forgery is the false making or altering, with intent to defraud, of any signature ..."). Such an intent is a "specific intent."
Our emphasis.
A person concerned in the commission of a crime, whether present or absent, and whether she directly commits the act constituting the offense, aids and abets in its commission, or directly or indirectly counsels or procures another to commit the crime, is a principal. La. R.S. 14:24. Only those persons who knowingly participate in the planning or execution of a crime are principals. State v. Hebert, 29,062 (La.App.2d Cir.1/22/97), 688 So.2d 612, writ denied, 97-0497 (La.9/5/97), 700 So.2d 503.

The Public Records Request
The state presented no evidence linking Durham to Doyle placing a false revision date on the Buyer job specification sheet or whiting-out "Submitted by S.A. Doyle" on the list of applicants. The state assumes that because Durham wanted to ensure that Holloway would be hired, which is not contended to be a crime, and because Durham would politically benefit from any concealment of unsavory aspects of the hiring process, then it must be inferred that Durham would be a principal to Doyle's efforts to back-date the revision to the job specifications or white-out that Doyle submitted Holloway's application. Without any evidence to support this allegation, this inference is nothing more than mere speculation.
The fact that Durham was Doyle's employer, and would benefit from her actions, does not automatically make Durham a principal to Doyle's crimes. Compare State v. Long, 94-0092 (La.9/16/94), 643 So.2d 132. Shirley Long and her husband Kenneth Long were convicted of arson with intent to defraud after a fire destroyed their home. At the time of the fire, the Longs were facing severe financial problems. Approximately 15 minutes before the fire was reported, Kenneth Long was stopped for speeding coming from the general direction of their home. Two months earlier, Shirley Long called her insurance agent about coverage under her homeowner's policy. The supreme court acknowledged that "a trier of fact's determination that a wife aided and abetted the commission of the charged offense by her husband must rest upon more than mere speculation based upon guilt by association arising from relational status." State v. Long, 643 So.2d at 134. Reversing Shirley Long's conviction, the court stated, "motive cannot alone provide the basis for determining that one spouse has `concerned' himself or herself in the fraudulent acts of the other spouse simply by reason of their common interests arising from their relational status." State v. Long, 643 So.2d at 135.
The evidence presented by the state, though brilliantly laid out, established only a possible motive by Durham. Durham cannot be found guilty due solely to a possible motive and her position as Doyle's employer. We reverse Durham's conviction of attempted forgery.

The Report to the Commission
The state contends in its original brief:
The evidence showed that appellant knew that the hiring policy at the time of Ray Holloway's hiring was the "top three" policy which her administration had initiated three years before. Appellant ordered Doyle to present to the Commission on February 8, 1996, an "explanation" of the parish's hiring process. The explanation which Doyle gave, and which was reflected in S-8, is the false document Doyle had created. Appellant, the evidence shows, knew or must have known the document and explanation were not an accurate description of hiring procedures, yet she made no move, either then or later, to correct them. Her silence, as she stood by and *11 watched, was an active endorsement of Doyle's crime. Appellant's involvement in the forgeries was then most apparent, and her guilt was proven beyond a reasonable doubt.
The record does not support this contention. Defendant's guilt at this instance, which the state argues is when Durham's involvement in the forgeries was "most apparent," is simply not apparent on this record.
It is not unreasonable to believe that Durham was unaware of exactly what the scoring procedure was at the time of Holloway's hiring. For example, Steve Primos, a former Assistant Administrator, always thought the top five scores were interviewed. Primos worked under the administrations of Durham as well as the previous Administrator. When asked to describe Durham's management style, he stated, "She is big-picture oriented, good-work oriented[,] doesn't go crazy about a lot of details." Durham would allow the department heads to take care of the details.
In January 1995, Billy Hanna was assigned the additional title and duties of Director of Operations for the Parish. Hanna and Durham agreed that he would be concerned with the actual operations of the Parish, while Durham would concern herself with the policies of the Parish. Hanna testified that he would accept what those in Human Resources tell him to be correct about the hiring procedures and scoring. Deidre Arinder, who worked in Human Resources under two Administrators, agreed that Durham granted very broad authority and responsibility to Human Resources and other departments.
If Durham was not overly concerned about details, but instead focused on the big picture, it is reasonable to believe that she was simply not aware of the specific details of the application scoring procedure.
Moreover, there even appeared to be an error in the actual scoring of the applications. The criteria sheet used by Doyle and Stanton to score the applicants assigned a score value of five for a degree. Holloway was given a four even though he has a degree in law enforcement from LSU. Three other applicants with college degrees were given a score of zero. Despite the fact the criteria sheet clearly stated a "Degree" is worth five points, Doyle and Stanton decided on their own that "Degree" meant a degree in a related field. Stanton conceded that she did not know what she was doing when she scored the applicants. Stanton even had the impression that Doyle did not know what she was doing when scoring the applicants. Stanton could not even recall actually scoring Holloway's application, believing that Doyle was the one who assigned Holloway a four. Properly giving Holloway a five would have placed Holloway in the top three. Linda Brown, acting Director of Human Resources, explained that the "three highest scores" meant everyone who was at the level of the top three scores was eligible to be interviewed. It did not necessarily mean the top three scorers.
The top three scoring procedure was not even followed when filling all classified positions. Gracie Samuels testified that the top three procedure was not used for clerical positions because those applicants took a skills test. Linda Brown explained that Doyle would have to approve any variation from the top three scoring procedure. Brown related that because of a high turnover rate for the positions of Helper and Compact Operator, Doyle instructed Human Resources to just make a certified list of all those who qualify instead of following the applicable procedure.
In addition, there was apparently a mistake involving who was actually supposed to be called for an interview, the length of the certified list notwithstanding. Stanton apparently had no idea of who was supposed to be on the interview list. After scoring the applicants, Doyle handed Stanton *12 a list of all the applicants and their telephone numbers and told her to call the people and set up the interviews. Stanton then took the list to Margaret Dunbar and told her to start calling the names on the list. Stanton testified that after Dunbar had called half the people on the list, she told Doyle that the interviews were being set up. Doyle then told Stanton that not everyone on the list should have been called. Stanton responded that at that point it would only be fair if everyone on the list was called.
Notes from a staff meeting held on March 27, 1995 state:
Hugh stated that his department would be interviewing for the buyer position over the next two days. Judy asked how many applicants he would be interviewing. Hugh stated that it was 13. Sharon stated that there were not that many people on the certified list, and asked Hugh how that many people were scheduled to be interviewed. Hugh reported that there had been some sort of miscommunication, and several individuals were called that should not have been. Judy asked that Hugh, Ann and Sharon meet in her office immediately following the staff meeting to clear this matter up.
Walmsley explained that at the time of this meeting, everyone had been called, so the decision was made not to call them back and cancel the interviews.
Walmsley testified that upon realizing that applicants other than those with the top three scores were on the certified list, he immediately went to see Doyle. During direct examination, Walmsley related that Doyle told him that because the job had two criteria, education or experience, the certified list included the top three from each criteria. He had never heard of this being done before. Walmsley gave a somewhat different version of events during cross examination. When presented with his deposition testimony, Walmsley testified how Doyle explained to him that because there had been a question about the educational requirement, the decision was made to interview anyone who had a degree.
The evidence establishes Doyle's incompetency rather than Durham's guilt. Had Doyle assigned Holloway a score of five for his education, he would have properly made the certified list on his own merit. Therefore, if Doyle and Durham were indeed part of some cabal to hire Holloway, why would Doyle lower his score and possibly prevent him from properly making the certified list and being interviewed? All this notwithstanding, Holloway would have been interviewed in any case, due to the error by the Finance Department of scheduling interviews with everyone on the list of applicants.
Furthermore, there is nothing unusual or peculiar about Durham asking or instructing Doyle, as Human Resources Director, to appear at the Commission meeting and give a report. Walmsley testified that he would frequently appear at Commission meetings upon Durham's request in order to answer any detailed questions. He also testified that Durham had other department heads attend meetings in order to answer questions from the Commissioners. Thus, asking Doyle and Stanton, for that matter, to give reports at the February 8, 1996 Commission meeting is consistent with Durham's style of leaving the details (and detailed questions) to her department heads.
As with Count 1, the state relies on Durham's participation in Holloway's hiring (motive) and the fact that she is Doyle's employer (relationship) to reach the ultimate conclusion that Durham is guilty of forgery. While the state makes a vigorous and skillful presentation of its case, the total evidentiary package fails to satisfy Jackson v. Virginia. Durham's forgery conviction is reversed.
This court is limited to examining only the evidence contained in the appellate record. Whether Mrs. Durham was a dedicated public employee, or whether she *13 was a conniving political hack is not for this court to decide. Moreover, the weight of public opinion, for or against the defendant, plays no part in this court's deliberations. The bottom line is that this record does not contain evidence proving beyond a reasonable doubt that Mrs. Durham committed the crimes charged.

DECREE
Durham's convictions of attempted forgery and forgery are REVERSED.
BROWN, J., concurs with reasons.
BROWN, J., concurring.
The scope of appellate review in criminal cases extends only to questions of law. La. Const. of 1974, art. 5, §§ 5(C) and 10(B). However, the United States Supreme Court in Jackson v. Virginia, supra, found that the Fourteenth Amendment Due Process Clause required a sufficiency of evidence review on appeal. The constitutional standard of review of facts is whether the evidence considered in the light most favorable to the prosecution could have convinced a rational juror that all elements of the crime were proven beyond a reasonable doubt. Jackson v. Virginia, supra. There is no separate test to be applied when circumstantial evidence forms the basis of a conviction; rather all evidence, whether circumstantial or direct, must satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922. Insofar as the majority opinion might be interpreted to impose an appellate review based on some higher degree of proof, I disagree.
Studs Terkel wrote of his profession, "This is not a lawyer's brief. Nor an annotated sociological thesis. It is simply an attempt to get the story ... from an impoverished battalion of survivors." The same applies equally to a prosecutor's authority to charge. Although arguing that the "big picture" showed a distasteful political hiring of Holloway, the prosecution concedes that the process was not illegal. Instead, it charges a cover-up by providing misinformation to the media and the Caddo Commission. A character in Robert Penn Warren's novel All The King's Men stated, "It had not been successful (his excursion into the past) because in the midst of the process I tried to discover the truth and not the facts." As explicated by the majority, without Sharon Doyle's testimony, you can no better connect this defendant with the alleged criminal acts than any other supervisor.
Further, the alleged acts forming the basis of the charges may be unlawful under other criminal statutes such as malfeasance (La. R.S. 14:135), but are not forgeries. The counts charge that defendant had Sharon Doyle lie in a response to a public record request by the newspaper and in a report to the Caddo Commission. Perjury did not apply. Although it may be unwise and immoral, it is not perjury to lie to The Times. Further, a person has to be under oath to commit perjury before the Caddo Commission. For the same reasons forgery is not an alternative. Malfeasance, however, clearly applies. For this defendant to allow another employee under her authority to wrongly perform a required duty is' malfeasance; however, as noted, there must be factual evidence connecting Doyle's acts to this defendant
Finally, Sharon Doyle was given by the Caddo Commission the authority to create and revise at will the hiring procedures to be used. She was not required to either notify or seek approval from the Commission. When she said all qualified applicants will be interviewed, that was the procedure.
APPLICATION FOR REHEARING
Before NORRIS, C.J., BROWN, WILLIAMS, CARAWAY, and DREW, JJ.
Rehearing Denied.